1

2

3                                                          O

4

5

6

7

8                  UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10

11   JULIA DAVIS and BOBBY      )
     JOE DAVIS,                  )   Case No. EDCV 07-0481-VAP
                                 )   (OPx)
12              Plaintiffs,      )
                                 )
13        v.                     )   **[Motion filed on December
                                 )   21, 2009]**
14   UNITED STATES OF            )
     AMERICA, JEFFREY DEAL,      )   **ORDER GRANTING IN PART AND
15   and ~~HERBERT KAUFER~~,     )   DENYING IN PART DEFENDANT
                                 )   UNITED STATES OF AMERICA'S
16              Defendants.      )   MOTION FOR PARTIAL SUMMARY
     _____ )   JUDGMENT**

17

18

19       Defendant the United States of America's Motion for

20   Partial Summary Judgment came before the Court for a

21   hearing on January 25, 2010.  After reviewing and

22   considering all papers filed in support of, and in

23   opposition to, the Motion, as well as the arguments

24   advanced by counsel at the hearing, the Court GRANTS in

25   part and DENIES in part the Motion, as set forth below.

26

27                  **I.   INTRODUCTION**

28       On April 23, 2007, Plaintiffs Julia and Bobby Joe
     ("BJ") Davis filed this action against Defendants the

United States of America ("the United States" or "the Government") and United States Immigration and Customs Enforcement ("ICE") Agents Jeffrey Deal[1] ("Deal") and Herbert Kaufer[2] ("Kaufer").  The action alleges a variety of wrongful acts by government agents following a 2004 complaint of sexual harassment lodged by Julia Davis, a United States Customs and Border Protection ("CBP")[3] employee, including searches of Plaintiffs' office and residence in 2004 and 2005, the 2005 arrest and prosecution of Plaintiffs on federal immigration fraud charges, and the 2006 arrest and prosecution of Plaintiffs on state firearms charges.

The operative complaint is the Second Amended Complaint ("SAC"), filed on July 17, 2008.  It  contains eight claims, two of them brought against only Defendants Deal and Kaufer pursuant to <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), asserting violations of Plaintiffs' rights under the First and Fourth Amendments to the United States

---

[1] The claims against Defendant Deal were dismissed by the Court, with prejudice, pursuant to stipulation by the parties, on January 25, 2010.

[2] The claims against Defendant Kaufer were dismissed by the Court, with prejudice, pursuant to stipulation by the parties, on January 21, 2010.

[3] Both CBP and ICE are component agencies within the United States Department of Homeland Security ("DHS"). Various actions at issue in this case were taken by each of these agencies, and some others were taken by officials in DHS headquarters.

1  Constitution.  (SAC ¶¶ 83, 117.)  The other six claims,
2  brought only against the Government pursuant to the
3  Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346,
4  2671-80, are for false imprisonment, malicious
5  prosecution, abuse of process, trespass, conversion, and
6  intentional infliction of emotional distress.  The claims
7  for conversion and false imprisonment have been dismissed
8  in their entirety, as has a portion of the trespass
9  claim.  (Doc. Nos. 127, 242.)
10
11     On December 21, 2009, the Government filed a motion
12  for partial summary judgment solely on Plaintiffs'
13  malicious prosecution and abuse of process claims.  On
14  December 28, 2009, Plaintiffs attempted to file an
15  opposition to the Motion, but the Court ordered that
16  filing stricken on January 5, 2010, due to various
17  violations of Local Rules and the Court's Standing Order.
18  (Doc. No. 258.)
19
20     On January 7, 2010, Plaintiffs filed an amended
21  memorandum in opposition to the Motion, an "Amended
22  Separate Statement of Genuine Issues" ("PSGI"), a
23  Declaration of Julia Davis, and 80 supporting exhibits.[4]
24  _____
25     [4] To comply with the Court's page limits, Plaintiffs'
    counsel removed the 36-page section entitled "Summary of
26  Facts" from its initial 54-page memorandum, and replaced
    it with the following statement: "Plaintiffs hereby
27  incorporate by reference the Declaration of Julia Davis,
    which is filed concurrently herewith."  Plaintiffs added
28                                             (continued...)

On January 14, 2010, the Government filed a Reply and Plaintiffs filed a "Supplemental Brief in Opposition." The Government filed a Response to this Brief on January 20, 2010.  The propriety and merits of these filings are discussed separately below.

## II. EVIDENTIARY ISSUES

Before resolving the merits of the Motion, the Court first must address serious problems presented by the evidence submitted and relied upon by both the Government and Plaintiffs.

### A.  The Government's Evidence

As required by the Local Rules of this Court, the Government filed a Statement of Uncontroverted Facts and Conclusions of Law in support of its Motion for Partial

---

[4](...continued)
seven pages of material to their memorandum of points and authorities.  Thus, although the Amended Opposition complies with the letter of the Court's Standing Order and January 5, 2010 Order striking the original opposition, it runs counter to the See Orantes-Hernandez v. Gonzales, 504 F. Supp. 2d 825, 850 (C.D. Cal. 2007), citing St. John v. McElroy, No. 95 CIV 9810 (KMW), 1996 WL 49956, at *3-*4 (S.D.N.Y. Feb. 6, 1996) clear spirit of those Orders. (failure to comply with spirit of Court order even if in compliance with strict letter is evidence of lack of good faith).  Nonetheless, in order to resolve this motion, and advance this case (filed nearly three years ago), the Court considers Plaintiffs' Amended Opposition.  Any further failure to comply with both the letter and spirit of the Federal Rules of Civil Procedure, the Federal Rules of Evidence, the Local Rules of this Court, and this Court's Standing Order may result in sanctions against counsel.

Summary Judgment.  (Doc. No. 246-1 ("DSUF").)  In the DSUF, the Government stated:

> The United States incorporates the Uncontroverted Facts submitted by Co-Defendants Herbert Kaufer and Jeffery [sic] Deal [Doc. Nos. 244-3 and 239-3] and exhibits, by reference to its Statement of Uncontroverted Facts and Conclusions of Law.

(DSUF ¶ 1 (alterations in original).)  In the DSUF, the Government cites to deposition testimony lodged with the Court only in connection with Defendant Kaufer's Motion for Summary Judgment.  (DSUF ¶ 3.)  Plaintiffs object to this "incorporation."  (PSGI ¶ 1.)

The Ninth Circuit has held that, when deciding a summary judgment motion, a court need not "perform a search, unassisted by counsel, through the entire record, to look for []evidence" that creates a genuine issue of material fact.  Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1030 (9th Cir. 2001).  See also Orr v. Bank of Am., 285 F.3d 764, 774-75 (9th Cir. 2002) (failure to cite to page and line number of deposition testimony in Statement of Undisputed Facts warrants exclusion of evidence).  But "Rule 56 may be adequately satisfied by a lawyer designating where (outside the opposition papers) the critical evidence can be found and what it says, though ordinarily the better practice would be to photocopy and attach the evidence to the opposition papers."  Carmen, 237 F.3d at 1030.

The rule set out in <u>Carmen</u> applies equally to evidence submitted in support of a motion for summary judgment, and the Court need not scour the record to find support for uncontroverted facts. "Judges are not like pigs, hunting for truffles buried in briefs." <u>Indep. Towers of Wash. v. Washington</u>, 350 F.3d 925, 929 (9th Cir. 2003), <u>quoting</u> <u>United States v. Dunkel</u>, 927 F.2d 955, 956 (7th Cir. 1991). The Government thus cannot generally "incorporate" the Statements of Facts and exhibits filed by Deal and Kaufer *en toto*. The Court may only consider the evidence that the Government has specifically identified, *i.e.,* only the deposition testimony of Julia Davis lodged in connection with Kaufer's motion.

Even if it was not attached to the Government's motion, this testimony can be considered so long as it is a part of the record – but it is not here. Agent Kaufer's Motion for Summary Judgment was withdrawn on December 21, 2009.[5] "The effect of withdrawal of a motion is to leave the record as it stood prior to the filing as though the motion had never been made." 56 Am. Jur. 2d Motions, Rules, and Orders § 32. <u>See also</u> <u>Caldwell-Baker Co. v. S. Ill. Railcar Co.</u>, 225 F. Supp. 2d 1243, 1259 (D. Kan. 2002); <u>Remley v. Lockheed Martin</u>

---

[5] The Government's Motion was filed later the same day.

<u>Corp.</u>, No. C00-2495CRB, 2001 WL 681257, at *2- *3 (N.D. Cal. 2001).  Hence, neither Agent Kaufer's motion nor any of the documents and exhibits filed in support of it remain a part of the record in this case.  The Court thus SUSTAINS Plaintiffs' objection to the admission of the deposition transcript, as well as all references to filings and evidence submitted in connection with the now-withdrawn motions.[6]

## B.  Plaintiffs' Evidence

### 1.  Plaintiffs' Amended Separate Statement of Genuine Issues

In its January 5, 2010 Order, the Court noted that Plaintiffs' Separate Statement of Genuine Issues violated Local Rule 56-2, in that it was not a "concise 'Statement of Genuine Issues' setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  (Doc. No. 258 at p. 2.)  In connection with their Amended Opposition, Plaintiffs filed an Amended Separate Statement of Genuine Issues. In this filing, Plaintiffs include extensive legal arguments about their theory of the case in the guise of "responses" to the Government's undisputed facts.  <u>See, e.g.</u>, PSGI ¶ 2 (2.5 page response discussing search of Davises' residence as response to undisputed fact

---

[6] Plaintiffs' responses to Deal's and Kaufer's Statements of Undisputed Facts are thus irrelevant and not considered.

1    regarding mailing of correspondence to San Bernardino

2    County District Attorney).  In doing so, Plaintiffs fail

3    to accomplish the purpose of an SGI: to identify clearly

4    what facts are in dispute.

5

6        **2.  Julia Davis's Declaration**

7        Plaintiffs have produced a 37-page declaration from

8    Plaintiff Julia Davis.  Much of the declaration is

9    inadmissable, as it includes statements as to the

10   feelings, intent and knowledge of other individuals and

11   entities,[7] which lack foundation, as they have no basis

12   in either Mrs. Davis's personal knowledge or the attached

13   exhibits, and statements of legal argument and legal

14

15   _____

16       [7] <u>See, e.g.</u>, Davis Decl. ¶ 6 (stating her supervisor
     was a "known sexual predator"); ¶ 20 (stating certain
17   findings of an EEOC Administrative Law Judge ("ALJ") are
     "obviously a great embarrassment to the DHS"); ¶ 23
18   (stating DHS "attempted to conceal" the ALJ's ruling
     "since they were not successful in attempting to
19   invalidate the judicial determination" and speculating
     why DHS amended a report to Congress); ¶ 26 (stating that
20   ICE agents "were obviously concerned not with the
     underlying incident, but with whether they could find
21   some possible misstatement"); ¶ 40 ("It is clear from the
     outset of the investigation I was viewed as the suspect
22   and all efforts were made to protect Ms. Boutwell. . ."); 
     ¶ 49 ("the government was aware that my requests for
23   unpaid leave to care for my husband BJ were proper"); ¶
     51 ("In exchange for Kates' cooperation in providing
24   unauthorized access to BJ Davis' and my personal
     documents . . ., Kaufer and Deal queried BJ Davis' name
25   in law enforcement databases . . .."); ¶ 58 ("these
     agents were continuing their pursuit of BJ Davis and I
26   with the hope of initiating criminal matters . . ."); ¶
     66 (stating DHS agents "recruited civilians" to steal
27   Davis' mail and impersonate her); ¶ 69 ("Agent Deal
     intentionally misrepresented . . ."); ¶ 85 (noting effect
28   of "malicious prosecution" on former co-workers).

conclusion,[8] which are inappropriate in a Rule 56(e)

declaration.  See Shakur v. Schriro, 514 F.3d 878, 889

(9th Cir. 2008) (rejecting affidavit submitted in

connection with summary judgment that failed to

"affirmatively show personal knowledge of specific

facts"); Silver v. Executive Car Leasing Long-Term

Disability Plan, 466 F.3d 727, 732 n. 2 (9th Cir. 2006)

(affirming exclusion of declaration which contained legal

argument under Rule 56, noting such argument is "not

appropriate for a declaration").  The Court does not

consider any such statements.


     Plaintiffs also seek to introduce 80 exhibits through

Julia Davis's declaration.  The proper foundation for

these exhibits "need not be established through personal

knowledge but can rest on any manner permitted by Federal

Rule of Evidence 901(b) or 902."  Sec. & Exch. Comm'n v.

Phan, 500 F.3d 895, 913 (9th Cir. 2007), quoting Orr, 285

---

     [8] See, e.g., ¶ 22 ("This act alone demonstrates an
ulterior motive for targeting BJ Davis and I for
prosecution.  The government could hardly have been more
blatant in its efforts to use the filing of criminal
charges to avoid the DHS's liability on my EEO
complaint."); ¶ 47 ("The only possible reason for such a
disclosure was to engender bias against me because of my
having brought a harassment claim against the DHS."); ¶
51 ("Such a query of [B.J. Davis's] name was completely
against [DHS] guidelines and regulations"); ¶ 55
(discussing who had legal authority to release certain
documents under Nevada law); ¶ 66 (opining that agents
"arranged a traffic stop without probable cause"); ¶ 75
("There was no basis for the government's prolonged
search of the residence. . . ); ¶¶ 76-77 (discussing law
of search and seizure).

F.3d at 774.  Several of these exhibits are not
sufficiently authenticated, lack foundation, or are
otherwise inadmissible, though, and thus the Court cannot
consider them.[9]

Exhibit 45 is a document labeled "Confidential," with
no other indication as to what it is.  In Davis's
Declaration, she merely states that the document is a
"true and correct copy of a document produced by the
government in the Case No. CR 05-757-AHM and Bates
Numbered 624 to 625."  (Davis Decl. ¶ 130.)  This
statement fails to identify what the document is, and
thus the exhibit lacks foundation and is inadmissible.
See, e.g., Bellah v. Am. Airlines, Inc., 656 F. Supp. 2d
1207, 1210 n. 4 (E.D. Cal. 2009); Calloway v. Contra
Costa County Jail Corr. Officers, No. C 01-2689 SBA, 2007
WL 134581, at *12 (N.D. Cal. Jan. 16, 2007).

Exhibit 17 is an "excerpt of an OPR interview with
Officer Carolina Cisneros."  (Davis Decl. ¶ 102.)  "A
deposition or an extract therefrom is authenticated in a
motion for summary judgment when it identifies the names
of the deponent and the action and includes the
reporter's certification that the deposition is a true

---

[9] Many exhibits not addressed here also pose serious
admissibility questions.  However, Plaintiffs do not cite
to these exhibits for any issues relevant to this motion,
and thus the Court need not determine their
admissibility.

1    record of the testimony of the deponent." <u>Orr</u>, 285 F.3d

2    at 774, <u>citing</u> Fed. R. Evid. 901(b); Fed. R. Civ. P.

3    56(e) & 30(f)(1).  The excerpt provided includes none of

4    these features, and Davis cannot authenticate this

5    exhibit by stating merely that it is a "true and correct

6    copy" of the transcript.  <u>See Orr</u>, 285 F.3d at 776.  Two

7    other exhibits are similarly unauthenticated transcript

8    excerpts.  (Davis Decl., Exs. 35, 37.)  All three

9    exhibits are inadmissible, and not considered by the

10   Court.

11

12        Exhibit 48, the Declaration of Attorney Peter

13   Szabadi, which is cited for the legal conclusions as to

14   who could give consent for a search of corporate property

15   under Nevada law and whether Mr. Davis had an

16   "expectation of privacy" under federal constitutional

17   law, Davis Decl. ¶¶ 55-56, is inadmissible for these

18   purposes.  <u>See</u> <u>Nationwide Transp. Fin. v. Cass Info.</u>

19   <u>Sys., Inc.</u>, 523 F.3d 1051, 1058-59 (9th Cir. 2008).

20

21        **3.  Plaintiffs' Supplemental Brief**

22        On January 14, 2010, Plaintiffs filed a "Supplemental

23   Brief in Opposition to the United States Motion for

24   Partial Summary Judgment," along with several

25   accompanying exhibits.[10]  The Brief concerns a July 20,

26   _____

27        [10]  Although within the text of this brief,
     Plaintiffs "request leave" for such a filing, the proper

28                                          (continued...)

                                11

2007 report prepared by the DHS Office of Inspector General ("OIG") ("the OIG Report") at the conclusion of an investigation into many of the events at issue in this action.

Plaintiffs contend that they did not learn of the existence of the OIG Report until a deposition conducted on November 12, 2009, and they subsequently discovered that one of the Government's experts had reviewed the report in preparing his expert testimony.  (Shayesteh Decl. ¶¶ 2-3.)  The Government produced a copy of the OIG Report on December 22, 2009.  (Id. ¶ 5.)  This copy did not include most of the exhibits attached to the original, however, and a section of the Report was redacted.  (Id.)  On January 11, 2010, the Government produced an unredacted version of the OIG Report, which included statements made by Assistant United States Attorney John Lee to OIG investigators.  (Id. at ¶ 8.)

In the Supplemental Brief, Plaintiffs ask the Court to (1) consider the unredacted version of the OIG Report in ruling on this motion and (2) compel the production of the exhibits attached to the original report.

_____

[10](...continued)
course would have been to file a separate ex parte application seeking leave to file this brief.

The Court has reviewed the unredacted material and finds it has no impact on the pending motion, as it only speaks to why the federal immigration fraud charges were dismissed and whether they should have been filed in the first instance.  As the Court explains below, Plaintiffs' claims regarding these issues are barred as a matter of law.  Moreover, the unredacted OIG Report is subject to a protective order in this case, and Plaintiffs failed to comply with the terms of that order, which requires such documents to be filed under seal.  (Doc. No. 78; Pls.' Supp. Br., Ex. 4.)  The Government has thus requested the Court order this and all other exhibits to Plaintiffs' Supplemental Brief be not only stricken, but deleted from the Court's electronic filing system.  That request is granted in a separate minute order.

As to the exhibits that Plaintiffs would have the Court summarily order the Government to produce, Plaintiffs cite no authority or justification for such extraordinary relief, long after any and all discovery deadlines have passed.  Moreover, in its response to Plaintiffs' Supplemental Brief, the Government has indicated that it has now produced the exhibits to Plaintiffs' counsel.  (Lantka Decl. ¶ 11.)

1    Accordingly, the Court orders Plaintiffs'
2  Supplemental Brief and all accompanying exhibits
3  STRICKEN.

4                    **III. UNCONTROVERTED FACTS**
5       The following facts are supported adequately by
6  admissible evidence and are uncontroverted by admissible
7  evidence on the record.  They are "admitted to exist
8  without controversy" for the purposes of this Motion.
9  See Local Rule 56-3.
10

11 **A.   Julia Davis's Employment with CBP**
12      **1.   The Sexual Harassment Complaint and**
13           **Investigation**

14      In 2002, Julia Davis began employment as a Customs
15 and Border Protection ("CBP") Agent, stationed at the
16 Port of Entry in San Ysidro, California ("the Port").
17 (Davis Decl. ¶¶ 5-6.)  Soon after beginning her
18 employment, her supervisor, Kevin Crusilla, began to
19 sexually harass her.  (Davis Decl. ¶¶ 6-7, Ex. 1 (June
20 17, 2005 Order and Opinion of Equal Employment
21 Opportunity Commission ("EEOC") Administrative Law Judge
22 ("ALJ") ("EEOC Op.") at p. 5.)[11]  She reported the
23 harassment to numerous supervisors, to no avail, before
24 escalating her complaint to the Deputy Port Director.
25 (Davis Decl. ¶¶ 7-8, EEOC Op. at p. 7.)  The Deputy Port
26 _____

27      [11] The Court exercises its discretion to admit the
   EEOC Order and Opinion into evidence.  See Amantea
28 Cabrera v. Porter, 279 F.3d 746, 749 (9th Cir. 2002).

Director told Davis a full investigation would be launched by the DHS OIG. (Davis Decl. ¶ 8, EEOC Op. at p. 7.) The harassment nonetheless continued. (<u>Id.</u>)

Julia Davis then obtained a Temporary Restraining Order and Preliminary Injunction from the California Superior Court ordering Crusilla not to harass her. (Davis Decl. ¶ 9; EEOC Op. at 8.)

At some point, Julia Davis lodged a sexual harassment complaint with the DHS Office of Professional Responsibility, the office in which Agents Deal and Kaufer worked. (Davis Decl. ¶ 11.) She also filed a grievance against DHS with the EEOC. (Davis Decl. ¶ 12.) Crusilla refused to cooperate with either the OIG or EEOC, and was allowed to retire without penalty in October 2003. (Davis Decl. ¶ 13, Ex. 12, EEOC Op. at p. 9.) A November 2003 ICE Office of Internal Audit investigation substantiated Davis's sexual harassment allegations, but no action was taken due to Crusilla's retirement. (Davis Decl., Ex. 12.)

On June 25, 2005, the EEOC ALJ issued a preliminary decision finding Davis had been subjected to unlawful sexual harassment, awarded her $145,500 in compensatory damages, and ordered the development of sexual harassment

1    policies and procedures and mandated sexual harassment

2    training at the Port.  (EEOC Op. at pp. 18, 21-25.)[12]

3        **2.  Julia Davis's Reports of "Security Breaches" and**

4              **Investigations**

5        In the summer of 2004, Julia Davis sent several

6    letters to various supervisors and DHS officials about

7    what she saw as threats to security at the Port.

8

9        In June 2004, Davis sent a letter to the Port

10   Director expressing concern over the reduction of

11   security staff and removal of metal detectors and X-ray

12   equipment from the Port.  (Davis Decl. ¶ 24, Ex. 13.)

13   Also in June 2004, Davis sent a letter to the DHS OIG,

14   describing an incident where she observed an Assistant

15   Port Director instruct a CBP Agent to falsify a person's

16   nationality on several documents.  (Davis Decl. ¶ 25, Ex.

17

18   ─────────────────

          [12] On August 18, 2005, DHS filed a motion before the
19   EEOC ALJ requesting that the Order be held in abeyance
     pending the resolution of the federal immigration fraud
20   charges, discussed further below, as a conviction would
     purportedly deprive the EEOC of jurisdiction over the
21   action.  (Davis Decl., Ex. 2.)  The ALJ denied the motion
     and issued a final decision and order, which adopted his
22   preliminary decision.  (Davis Decl., Ex. 3.)

23        The ALJ also determined that Davis's August 2004
     resignation, discussed below, was involuntary.  (EEOC Op.
24   at p. 10.)  In its review of related Merit Systems
     Protection Board ("MSPB") proceedings, the Court of
25   Appeals for the Federal Circuit affirmed the MSPB's
     contrary finding, and held that "[t]he issue of
26   involuntary resignation was not litigated before the EEOC
     and it was not necessary to resolve the sexual harassment
27   claim," and thus non-binding dicta.  Davis v. Dep't of
     Homeland Sec., 305 Fed. App'x 659, 661 (Fed. Cir. 2008)
28   (per curiam).

14).  On August 3, 2004, Agent Deal and Agent Robert Broyles interviewed Davis about this incident.  (Davis Decl. ¶ 26, Ex. 15.)

On July 5, 2004, Davis sent a letter to the Federal Bureau of Investigation ("FBI") to report an "unusually high number of individuals" who had entered the United States through the Port over the July 4 holiday from "special interest countries," and noted an insufficient number of Intelligence Officers were on duty that day. (Davis Decl. ¶ 30, Ex. 20.)  She stated that the Port was not "secure under the current administration."  (Id.) This letter was received by a reporter for the Los Angeles Times, who confronted CBP Commissioner Robert Bonner about it at a press briefing.  (Davis Decl., Ex. 24 (Fasano Dep.) 109:15-22; Ex. 25 at pp. 2-4.)  CBP then launched an investigation of Julia Davis to determine if any misconduct was involved when she sent the July 5, 2004 letter.  (Davis Decl., Ex. 27.)

### 3.  Julia Davis's Cellular Telephone Damage Claim and Investigation

Also in July 2004, Julia Davis filed a tort claim for damages to her cellular telephone, alleging her supervisor, Susan Boutwell, dropped Davis's bag, which contained the phone, "aggressively and with specific intent."  (Davis Decl. ¶ 36, Ex. 34.)  An investigation was launched, led by Agent Deal, who was told by Agent

17

1  Kaufer to give the investigation "priority." (Id.; Davis
2  Decl., Ex. 9 ("Deal 2005 Dep.") 21:8-23:10.)  Boutwell
3  denied touching Davis's bag, and told the Port Director
4  that this was "one of the many fictitious complaints that
5  Julia Davis has invented" and was designed "to bolster
6  her lawsuit against the [CBP]."  (Davis Decl., Ex. 29.)
7  Boutwell and Davis both were interviewed later by Agent
8  Deal about this incident.  (Davis Decl. ¶¶ 39, 41; Ex.
9  30, p. 24; Deal 2005 Dep. 58:2-24.)[13].

10

11      After completing the investigation of the claim in
12  October 2004, Agent Kaufer wrote a report concluding that
13  Julia Davis had "made a false allegation against her
14  supervisor and lied under oath."  (Davis Decl., Ex. 34 at
15  ¶ 6.)  Agent Kaufer stated that the videotape recording
16  of the area at issue refuted Julia Davis's claims.  (Id.
17  at ¶ 5.)

18
19      **4.  Investigation of Julia Davis's February 2004
         Leave to Care for BJ Davis**

20      In February 2004, Julia Davis took an unpaid leave of
21  absence under the Family and Medical Leave Act (FMLA) to
22  care for her husband, BJ Davis, while he was working
23  directing a movie, "Forget About It," on set in Arizona.

24  _____

25      [13] In her Declaration, Julia Davis states that
    Boutwell changed her position after viewing videotape
26  that showed her moving the bag.  (Davis Decl. ¶ 38.)
    Neither the cited portion of the transcript of Boutwell's
27  interview, nor any other portion of the excerpt of that
    interview submitted to the Court, provide support for
28  this statement.

(Davis Decl. ¶ 48, Ex. 43.)  BJ Davis had been diagnosed with an unidentified "potentially terminal illness." (Davis Decl. ¶ 49.)  As part of their investigation of the tort claim, Agents Deal and Kaufer also investigated this leave based on information that Julia Davis had actually been working on the movie with BJ Davis.  (Deal 2005 Dep. 59:4-60:15.)  Julia Davis maintains she was not working on the movie.  (Davis Decl. ¶ 49.)

Among the interviews conducted as part of the agents' investigation were several meetings with Kimberly Kates, interim President of Beverly Hills Film Studios, Inc. ("BHFS").  (Davis Decl., Ex. 44 ("Kates Decl.") ¶¶ 2-17.) BJ Davis previously had served as President of BHFS until a dispute which was the subject of civil litigation between BJ Davis, BHFS, Kates, and other persons.  <u>See</u> Davis Decl., Ex. 50 (Complaint, <u>BJ Davis v. Beverly Hills Film Studios, Inc., et al.</u>, Los Angeles Super. Ct. No. BC 323455, Oct. 25, 2004).  This lawsuit was pending at the time Kates was approached by Agents Kaufer and Deal; it later was settled.  (Kates Decl. ¶¶ 13, 19.)  When Agent Kaufer initially contacted Kates, he said he needed to discuss BHFS's "defamatory" use of a DHS logo, and told her the FBI in Arizona was investigating her and her company, and BJ Davis had instigated the investigation. (Kates Decl. ¶ 2, Supp. ¶ 1.)  Kates ultimately spoke with Agent Kaufer more than 15 times, and Agent Deal six

or seven times.  (Kates Decl. ¶ 2.)  In the course of these conversations, Agent Kaufer told Kates that DHS had performed a "full search" on BJ Davis and discovered he had been convicted of murder and had a "violent past." (Kates Decl. ¶ 4.)  At one point, he allowed Kates to "glance at the file with BJ's criminal charge of Murder/Theft."  (Id.)

Agent Kaufer also asked Kates about Julia Davis's involvement in the production of "Forget About It" and about BJ Davis's health at that time.  (Kates Decl. ¶¶ 5-6, 9-10.)  Kates told him that Julia Davis had only worked on the film as a writer, and that, although she did not know details, BJ Davis "seemed genuinely sick." (Id.)

Agent Kaufer also told Kates that the Agents were investigating "any criminal activity by Julia Davis," and wanted to know if Kates thought Julia Davis was "faking" her sexual harassment claim.  (Kates Decl. ¶ 7.)  Kates responded she had no reason to believe Julia was making up the sexual harassment allegations.  (Id. ¶¶ 7, 14.)

Kates told Agents Kaufer and Deal that BJ Davis had told her that her "actions would lead to [her] demise," and that she had been told by a coworker that BJ had threatened to kill another coworker.  (Kates Decl. ¶ 3,

1  Supp. ¶ 3.)  Agent Kaufer urged Kates to file criminal

2  charges against BJ Davis and seek a temporary restraining

3  order based on these threats, but she chose not to, as

4  she "didn't take the threats that seriously."  (Kates

5  Decl. ¶ 3, Supp. ¶ 2.)

6

7       **5.   The Results of the Investigations**

8       On August 20, 2004, Associate Special Agent in Charge

9  of the OPR, James Wong ("Wong"), sent a letter to Joyce

10 Henderson, CBP San Diego Field Office Acting Director,

11 Field Operations.  (Davis Decl., Ex. 40.)  In that

12 letter, Agent Wong stated:

13        We have found evidence, which would lead a
          reasonable person to substantiate numerous
14        charges of falsification against CBPI Davis to
          include: knowingly making false allegations
15        against agency personnel, making false
          statements under oath and filing a fraudulent
16        tort claim.

17 (Id.)  Citing security concerns, Agent Wong recommended

18 Julia Davis be placed on administrative leave pending

19 review by the CBP Disciplinary Review Board.  (Id.)

20 Later that same day, Henderson acted upon this

21 recommendation and placed Julia Davis on administrative

22 leave.  (Davis Decl., Ex. 41.)  Davis tendered her

23 resignation the same day, as a result of what she

24 identifies as "blatant retaliation" for her EEOC claim

25 and letters about security concerns.[14]  (Davis Decl. ¶¶

26 _____

27      [14] Julia Davis later appealed to the MSPB in an
   attempt to get her job back.  (Davis Decl., Exs. 25, 42,
28                                          (continued...)

21

1  57, 60.)  Three weeks later, a determination was made

2  that Julia Davis's FMLA leave request was fraudulent.

3  (Davis Decl., Ex. 43.)

4

5  **B.   The Federal Criminal Action**

6       **1.   The Investigation and Filing of Charges**

7       In January 2005, Agent Deal began an investigation

8  into potential marriage fraud by the Davises, based on

9  information received from the CBP Office of General

10  Counsel that Julia Davis married BJ Davis in February

11  1995, emigrated to the United States in June 1995, and

12  became a naturalized United States citizen in October

13  1999.  (OIG Report at p. 2.)  After completing his

14  investigation, Agent Deal concluded that Julia Davis had

15  "paid BJ Davis $10,000 to marry her and then filed a

16  petition that allowed her to immigrate to the United

17  States."  (Id.)[15]

18

19       Based on the results of this investigation, the

20  United States Attorney's Office for the Central District

21  of California sought to indict Julia Davis on charges of

22  _____

23       [14](...continued)
   65.)  This appeal was decided in favor of DHS in a
24  decision affirmed by the Court of Appeals for the Federal
   Circuit on December 18, 2008.  Davis v. Dep't of Homeland
25  Sec., 305 Fed App'x 659 (Fed. Cir. 2008) (per curiam).

26       [15] While Plaintiffs have produced evidence which
   calls the accuracy of this conclusion into dispute, Davis
27  Decl. ¶ 2, they have not produced any evidence
   controverting the fact that Deal so concluded at the
28  time.

conspiracy, 18 U.S.C. § 371; unlawful procurement of citizenship, 18 U.S.C. § 1425(b); and aiding and abetting unlawful procurement of citizenship, 18 U.S.C. §§ 2(a), 1425(b); and to indict BJ Davis on conspiracy and unlawful procurement of citizenship charges alone. (OIG Report at p. 2.)

On August 9, 2005, Julia and BJ Davis were indicted on each of the charges by a grand jury in this District, and arrest warrants were issued. (Davis Decl., Ex. 31 ("ICE Report") at p. 1.)

### 2.   The Execution of the Arrest Warrants

Agent Deal and other ICE OPR Agents conducted surveillance of the Davises' home in Yucca Valley for a week before their grand jury indictment. (ICE Report at p. 2; Davis Decl., Ex. 54 ("SRT Report") at p. 1.) During that week, Agents Deal and Kaufer contacted the ICE Special Response Team ("SRT"), seeking to use the SRT to affect the arrests of the Davises, citing BJ Davis's status as someone who had been "convicted of first-degree murder" and Julia Davis's "former status as a federal officer." (ICE Report at p. 2.) Agent Deal created an Operational Plan for the SRT to employ in executing the arrest warrants. (SRT Report at p. 1.)

On August 10, 2005, ten DHS Internal Affairs Agents, a United States Marshal, seventeen SRT members, eight unmarked cars and a Blackhawk helicopter arrived at the Davises' residence in Yucca Valley to execute warrants for the Davises' arrests.[16]  (ICE Report at p. 4; SRT Report at pp. 2-3; Davis Decl., Ex. 55 ("Kot Decl.") ¶¶ 2-3, 9; Ex. 56 ("Kovalska Decl.") ¶¶ 2, 4; Ex. 57 ("Judd Decl."), Ex. 62.)

Agents first attempted to enter the house using a battering ram on a side door.  (ICE Report at p. 4; SRT Report at p. 3.)  They then entered through another door, which was voluntarily opened by Julia Davis's father, Mykola Kot.  (SRT Report at p. 3.) They then handcuffed and detained Kot and Julia Davis's mother, Galyna Kovalska.  (ICE Report at p. 5; SRT Report at p. 3; Kot Decl. ¶ 4; Kovalska Decl. ¶¶ 5-7.)  Kot, a sixty-one year old man who was wearing only underwear and socks, was kept outside in the sun for an hour while agents searched the house, although he asked for medication and to be allowed inside the house.  (Kot Decl. ¶¶ 4, 6.)  Kot's finger was broken in the raid, and Kovalska was bruised. (Davis Decl., Exs. 60.)

---

[16] Although Julia Davis discussed this at length in her Declaration, Davis Decl. ¶¶ 68-75, there is no foundation for her statements, as she was not present at that time.  The statements thus are inadmissible.

Neither Julia nor BJ Davis were present at the house at the time the warrants were executed.  (ICE Report at p. 5; SRT Report at p. 3.)   ICE Agents searched the house, and seized a Remington shotgun and seven rounds of ammunition from the master bedroom of the house, "[s]ince BJ Davis is not to possess firearms."  (ICE Report at p. 5; see also Davis Decl., Ex. 66, ¶¶ 3-4; SRT Report at p. 3.)[17] The Agents also examined and took photographs of personal effects within the house, and noted evidence that suggested BJ Davis was living in the house and staying in the master bedroom.  (ICE Report at p. 5; Kot Decl. ¶ 13; Kovalska Decl. ¶ 8.)   The house was "cleared" in approximately four minutes (SRT Report at p. 3), but the search of the residence lasted approximately one hour.  (Kot Decl. ¶ 6.)

### 3.   Termination of the Federal Action

BJ and Julia Davis surrendered to the United States Marshal on August 16, 2005.  (ICE Report at p. 6.)   On March 3, 2006, the Government filed an ex parte application to dismiss all charges against Mr. and Mrs. Davis without prejudice, based on the Davises' allegations of misconduct by OPR Agents Deal, Kaufer, and Wong.  (Case No. CR 05-757-AHM,

---

[17] Although there is conflicting evidence as to where exactly the shotgun was found, (Davis Decl. ¶ 78; Ex. 31 at p. 5; Ex. 66, ¶ 4), this conflict is immaterial here.

Doc. No. 70; OIG Report at p. 3.)  On March 7, 2006,
the Honorable A. Howard Matz granted the Government's
application.  (Case No. CR 05-757-AHM, Doc. No. 74.)

## C.  The State Criminal Charges

In the course of his investigations of the
Davises' marriage, Agent Deal received information
that BJ Davis was arrested and sentenced for
involvement in a homicide[18] in 1973 in Shreveport,
Louisiana.  (OIG Report at p. 2; Davis Decl., Ex. 78
("Deal 2009 Dep.") 129:2-137:20; Wong Letter Ex. 2.)
According to this information, BJ Davis was granted a
pardon on October 11, 1995, which restored all civil
rights except the right to possess firearms.  (OIG
Report at p. 2.)

On August 11, 2005, the day after the raid on the
Davises' house, Agent Kaufer requested a weapons
trace on the shotgun taken from the residence.
(Davis Decl., Ex. 70.)  In that request, he stated
that the shotgun "was recovered from the residence of
a convicted felon (manslaughter)."  (Id.)  The

---

[18]  In their submissions on this motion, Plaintiffs
accurately note that BJ Davis was convicted of
manslaughter, and not murder.  See, e.g., Davis Decl. ¶
69; Wong Letter, Ex. 2.  All records of the conviction
before the Court, which Agent Deal purportedly reviewed,
refer to the crime as a manslaughter.  The OIG
Investigative report, however, as well as Deal in his
deposition, refer to the crime as a "murder."

26

Firearms Trace Summary, produced by the Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives National Tracing Center, showed that the shotgun had been purchased by Julia Davis on April 5, 2005.  (Davis Decl., Ex. 71.)

On November 18, 2005, Agent Kaufer sent Assistant United States Attorney John Lee, who was prosecuting the federal immigration fraud case, a letter "strongly urg[ing]" Lee to charge BJ Davis with a violation of 18 U.S.C. § 922(g)(1), which bars the possession of firearms by convicted felons.  (Davis Decl., Ex. 72.)  No such charge was ever brought.

On December 9, 2005, Agent Wong[19] mailed a letter to Rick Young, Supervisory Deputy District Attorney in the San Bernardino County District Attorney's Office, and Max Pfenning, Special Agent in the California Department of Justice Firearms Division. (Def.'s Ex. 1 ("Wong Letter").)  The letter stated that, on August 9, 2005, agents found a loaded Remington shotgun at the Davises' residence in Yucca Valley, California.  (Id. at p. 1.)  It further stated this was a "probable violation" of the California Penal Code, based on BJ Davis's status as

---

[19] Agent Deal wrote the initial draft of this letter. (Deal 2009 Dep. at 231:13-31.)

a convicted felon.  (<u>Id.</u>)  The letter mentioned that DHS believed Julia Davis was aware of this violation, based on documents filed in the earlier MSPB proceedings and a previous civil action.  (<u>Id.</u> at p. 2.)

The letter stated that BJ Davis had been convicted of manslaughter and accessory after the fact in Louisiana on June 21, 1974.  (Wong Letter at pp. 1-2.)  It noted that BJ Davis was pardoned for this crime on October 11, 1995, but with the condition that he not "own, possess, receive, ship, or transport firearms."  (<u>Id.</u> at p. 2.)  In the letter, Agent Wong also included several details as to the purchase of and ownership of the shotgun.  (<u>Id.</u>)  Agent Wong also stated there was "strong evidence" that BJ Davis had "rented/acquired/possessed" other weapons from a firearms dealer in Burbank, California, using funds from BHFS.  (<u>Id.</u> at p. 3.)

Along with the letter, Agent Wong attached fifteen exhibits, including documents relating to the immigration fraud charges filed against the Davises and the Louisiana conviction and pardon, declarations from Julia Davis's parents relating to the August 10, 2005 raid on the Davises' house, a motion from Julia

1  Davis's MSPB proceedings, and materials relating to
2  the settlement of the civil action between BJ Davis
3  and BHFS.  (Wong Letter, Exs. 1-15.)   The letter
4  referred the recipients to Agents Kaufer and Deal
5  should they seek more information or assistance
6  regarding the matter.  (Id. at p. 3.)  Agent Deal met
7  with Rick Young in the San Bernardino County District
8  Attorney's office in January 2006 and presented him
9  with information about the case.  (Deal 2009 Dep.
10 236:16-22.)

11

12     On January 25, 2006, a felony complaint was filed
13 in the California Superior Court, County of San
14 Bernardino, charging both BJ and Julia Davis of
15 violating California Penal Code § 12021(a)(1) by
16 "own[ing], possess[ing], purchas[ing], receiv[ing],
17 and hav[ing] custody and control" of a shotgun, after
18 *both* were purportedly convicted of manslaughter on
19 June 21, 1974 in Louisiana.  (Davis Decl., Ex. 73.)

20

21     On November 2, 2006, the Superior Court granted
22 both Davises' petitions to seal and destroy the
23 records of this arrest and declare them factually
24 innocent pursuant to Cal. Penal Code § 851.8.  (Davis
25 Decl., Ex. 74.)

26

27

28

**D.   The OIG Report**

On April 10, 2006, Julia Davis filed a complaint against Agent Wong with the Washington, D.C. office of ICE OPR in Washington regarding the events of August 10, 2005.  (Davis Decl., Ex. 76 ("OIG Report"), Ex. 1 at pp. 6-24.)  BJ Davis filed an independent complaint with the same office on October 8, 2006, accusing Agents Deal, Broyles, Kaufer, and Wong of improperly "divulging formal complaints and protected disclosures made to the Federal Bureau of Investigation" in an unrelated matter.  (OIG Report, Ex. 1 at p. 26.)

On June 13, 2007, the DHS OIG issued a Report of Investigation on Agents Wong, Kaufer, Deal, and Group Supervisor Robert Claborn and their involvement in the raid and search on the Davises' residence, which concluded "the use of the helicopter was appropriate and that no warrant-less search was conducted."  (OIG Report at p. 1.)

### III. DISPUTED FACTS

The following disputed fact is material and relevant to Plaintiff's claims.  There is conflicting evidence as to what, if any, items other than the shotgun were taken from the Davises' Yucca Valley house on the day it was searched.  Agent Deal

maintains that no items were seized.  (Davis Decl.,
Ex. 66.)  Witness Matthew Judd has stated that he saw
agents leaving the house with "white papers and boxes
with something sticking out of them" that they did
not have "when they first ran in."  (Judd Decl.)
Julia Davis's parents, Mykola Kot and Galyna
Kovalska, have stated that documents and their
Ukrainian passports were taken from the house in the
search.  (Kot Decl. ¶¶ 12, 15; Kovalska Decl. ¶ 13,
17.)

### IV. LEGAL STANDARD

A motion for summary judgment shall be granted
when there is no genuine issue as to any material
fact and the moving party is entitled to judgment as
a matter of law.  Fed. R. Civ. P. 56(c); Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).
The moving party must show that "under the governing
law, there can be but one reasonable conclusion as to
the verdict." Anderson, 477 U.S. at 250.

Generally, the burden is on the moving party to
demonstrate that it is entitled to summary judgment.
Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998);
Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.,
707 F.2d 1030, 1033 (9th Cir. 1983).  The moving
party bears the initial burden of identifying the

elements of the claim or defense and evidence that it
believes demonstrates the absence of an issue of
material fact.  Celotex Corp. v. Catrett, 477 U.S.
317, 323 (1986).

    Where the non-moving party has the burden at
trial, however, the moving party need not produce
evidence negating or disproving every essential
element of the non-moving party's case.  Celotex, 477
U.S. at 325.  Instead, the moving party's burden is
met by pointing out that there is an absence of
evidence supporting the non-moving party's case.  Id.
The burden then shifts to the non-moving party to
show that there is a genuine issue of material fact
that must be resolved at trial.  Fed. R. Civ. P.
56(e); Celotex, 477 U.S. at 324; Anderson, 477 U.S.
at 256.  The non-moving party must make an
affirmative showing on all matters placed in issue by
the motion as to which it has the burden of proof at
trial.  Celotex, 477 U.S. at 322; Anderson, 477 U.S.
at 252.  See also William W. Schwarzer, A. Wallace
Tashima & James M. Wagstaffe, Federal Civil Procedure
Before Trial § 14:144.

    A genuine issue of material fact will exist "if
the evidence is such that a reasonable jury could
return a verdict for the non-moving party."

1   <u>Anderson</u>, 477 U.S. at 248.   In ruling on a motion for

2   summary judgment, the Court construes the evidence in

3   the light most favorable to the non-moving party.

4   <u>Barlow v. Ground</u>, 943 F.2d 1132, 1135 (9th Cir.

5   1991); <u>T.W. Electrical Serv. Inc. v. Pacific Elec.</u>

6   <u>Contractors Ass'n</u>, 809 F.2d 626, 630-31 (9th Cir.

7   1987).

8

9                         **V. DISCUSSION**

10       The FTCA provides that the United States may be

11   held liable for "personal injury or death caused by

12   the negligent or wrongful act or omission of any

13   employee of the Government while acting within the

14   scope of his office or employment, under

15   circumstances where the United States, if a private

16   person, would be held liable to the claimant in

17   accordance with the law of the place where the act or

18   omission occurred."   28 U.S.C. § 1346(b)(1).   The

19   United States is to be held liable "in the same

20   manner and to the same extent as a private individual

21   under like circumstances."   28 U.S.C. § 2674.   <u>See</u>

22   <u>also</u> <u>United States v. Olson</u>, 546 U.S. 43 (2005).

23

24       The Court thus examines Plaintiffs' tort claims

25   under California law, as the acts alleged occurred

26   within California.   <u>Bressi v. Ford</u>, 575 F.3d 891, 900

27   n. 9  (9th Cir. 2009).

28

**A.   Malicious Prosecution**

Plaintiffs' malicious prosecution claim is based on their allegations that federal agents caused them to be prosecuted, without probable cause, in the San Bernardino County Superior Court on charges of being convicted felons in unlawful possession of a firearm. (SAC ¶ 128.)

To prevail on a claim of malicious prosecution, a plaintiff "must establish that the prior underlying action (1) was commenced by or at the direction of the defendant, or the defendant continued to prosecute it after discovering it lacked probable cause, and it was pursued to a legal termination in plaintiff's favor; (2) was brought without probable cause; and (3) was initiated with malice."  <u>HMS Capital, Inc. v. Lawyers Title Co.</u>, 118 Cal. App. 4th 204, 213 (2004).  The Government argues that Plaintiffs can establish neither that the action "was commenced by or at the direction" of the United States or its employees, nor that the federal agents involved lacked probable cause.

**1.   Commencement of the Action**

The Government argues that the San Bernardino County District Attorney made the "independent prosecutorial decision" to file the criminal charges

against Plaintiffs, and thus the federal "investigatory agents" cannot be held liable for this decision under a theory of malicious prosecution. (Def.'s Mem. at 8-9.)

The Government bases this argument on <u>General Dynamics Corp. v. United States</u>, 139 F.3d 1280 (9th Cir. 1998). There, the Ninth Circuit held that a plaintiff could not sustain a malicious prosecution claim against a federal investigative agency under the FTCA, based on a report the agency negligently prepared and provided to federal prosecutors, who brought an indictment against the plaintiff. <u>Id.</u> at 1283-86. The court's holding in <u>General Dynamics</u>, however, was based explicitly on an interpretation of a provision of the FTCA, 28 U.S.C. § 2680(a), which bars claims against the United States for the discretionary functions of its employees. The court found the plaintiff's claim was an improper attempt to "recharacterize" the prohibited claim against federal prosecutors for their discretionary action as a claim the investigators. 139 F.3d at 1286. Here, there is no such attempt to evade 28 U.S.C. § 2680(a), as the prosecutors who made the decision were state, not federal actors.[20]

---

[20]   This Court also has rejected previously the Government's argument that the OPR Agents themselves were
                              (continued...)

1    Additionally, the Supreme Court's intervening
2    decision in <u>United States v. Olson</u>, 546 U.S. 43, 46
3    (2005), calls <u>General Dynamics</u> into question inasmuch
4    as it relied on principles of California law relating
5    to the liability of state and local law enforcement
6    officers for charging decisions by prosecutors.
7    Under California law, law enforcement officers are
8    statutorily immune from liability for malicious
9    prosecution.  <u>Asgari v. City of Los Angeles</u>, 15 Cal.
10   4th 744, 752 (1997), <u>citing</u> Cal. Gov't Code section
11   821.6.  The Supreme Court's decision in <u>Olson</u> makes
12   this immunity irrelevant, though.
13
14       In <u>Olson</u>, the Ninth Circuit had held that where
15   an FTCA claim is based on "unique governmental
16   functions," the Government would be liable if "a
17   state or municipal entity would be subject to
18   liability under the law where the activity occurred."
19   546 U.S. at 45, <u>quoting</u> 362 F.3d 1236, 1240 (9th Cir.
20   2004). Reversing the Ninth Circuit's decision, the
21
22   ────────────────
         [20](...continued)
23   acting in a discretionary function, and the Government
     does not appear to be asking the Court to revisit that
24   determination.  <u>See</u> September 4, 2009 Minute Order
     Denying Motion to Dismiss (Doc. No. 179) at pp. 5-7.
25
         In light of the Court's interpretation of <u>General
26   Dynamics</u> and California law under <u>Olson</u>, the Court does
     not address Plaintiffs' contention that their claims fall
27   under an exception to <u>General Dynamics</u> in that they
     "arise from the government's failure to follow its own
28   required procedures."  (Am. Opp'n at p. 23.)

Olson Court held that the FTCA requires courts to
look to the state law liability of private persons,
not to that of public employees or entities, when
assessing the Government's liability under the FTCA,
even when the tort claim is based upon the
performance of "uniquely governmental" functions.
546 U.S. at 46.

The appropriate inquiry thus is whether, under
California law, the independent decision of a local
prosecutor would bar a malicious prosecution action
against a private person.  This scenario has been
examined in cases where private persons maliciously
have lodged complaints with or given testimony to
district attorneys or other prosecutorial officials.
Under California law, such persons *can* be liable for
malicious prosecution so long as they were "actively
instrumental in causing the prosecution." Cedars-
Sinai Medical Center v. Super. Ct., 206 Cal. App. 3d
414, 417 (1988).[21]  See also Lauter v. Anoufrieva, 642
F. Supp. 2d 1060, 1093 (C.D. Cal. 2009) (private
citizens who filed police report may be liable for
malicious prosecution); Sims v. United States, No.

_____

[21] The Court acknowledges that California law differs
from that of other states in this respect.  Compare
Bressi v. Ford, 575 F.3d 891, 899 (9th Cir. 2009) (in
affirming dismissal of FTCA malicious prosecution claim,
noting Arizona law bars a malicious prosecution claim
where a criminal prosecutor has made an independent
decision to prosecute).

1  2:07-cv-02082-MCE, 2008 WL 4813827, at *4 (E.D. Cal.
2  Oct. 29, 2008) (applying Cedars-Sinai in FTCA case);
3  Ludwig v. Super. Ct., 37 Cal. App. 4th 8, 25 n. 26
4  (1995) (restating "actively instrumental" test);
5  Goehring v. Wright, 858 F. Supp. 989, 1000 (N.D. Cal.
6  1994) (neighbors may be liable for malicious
7  prosecution arising out of false complaints to
8  police).  Under such a theory, a plaintiff must show
9  "that the defendant has at least sought out the
10  police or prosecutorial authorities."  Sullivan v.
11  County of Los Angeles, 12 Cal. 3d 710, 720 (1974).
12
13      The letter from Agent Wong states:  "We [ICE]
14  present this matter to you for probable violations of
15  the California [P]enal [C]ode."  (Def.'s Ex. 1 at p.
16  1.)  The letter laid out detailed evidence against
17  the Davises, and indicated an active desire to assist
18  in any prosecution that might come about.  Agent Deal
19  then met with the prosecutor on the case.  Based on
20  this evidence, Plaintiffs have produced sufficient
21  evidence to allow a fact finder to conclude that
22  federal agents "sought out" prosecutors, and were
23  "actively instrumental" in causing the state criminal
24  prosecution.  Summary judgment on this basis thus is
25  inappropriate.
26
27
28

1          **2.   Probable Cause**

2       The Government also argues that the undisputed

3   evidence establishes that the federal agents had

4   probable cause in instigating the state criminal

5   prosecution, and hence Plaintiffs cannot prevail on

6   their malicious prosecution claim.

7

8       Under California law, in the context of malicious

9   prosecution, probable cause is defined as ". . . an

10  honest suspicion or belief on the part of the

11  instigator of the prosecution, founded upon facts

12  sufficiently strong to warrant the average person in

13  believing the charge to be true." <u>Cummings v. Fire</u>

14  <u>Ins. Exch.</u>, 202 Cal. App. 3d 1407, 1419 (1988).  This

15  standard is applied "based upon the state of a

16  defendant's knowledge at the time a lawsuit is

17  initiated and . . . the facts known to the

18  defendant." <u>Lauter</u>, 642 F. Supp. 2d at 1093.

19

20      Plaintiffs were charged with violating California

21  Penal Code § 12021(a)(1).  The relevant elements of

22  this crime are (1) the defendant is "[a] person who

23  has been convicted of a felony under the laws of the

24  United States, the State of California, or any other

25  state, government, or country" and (2) the defendant

26  "owns, purchases, receives, or has in his or her

27

28

1  possession or under his or her custody or control any

2  firearm."  Cal. Penal Code § 12021(a)(1).

3

4      Agents Wong and Deal had probable cause to

5  believe BJ Davis had committed this crime at the time

6  they composed and sent the letter.  They had reliable

7  information that BJ Davis had been convicted of a

8  felony - manslaughter - in the State of Louisiana.

9  (Wong Letter, Exs. 2, 7, 8.)  They also had reliable

10  information that a shotgun was found in the master

11  bedroom of BJ Davis's house.  (Wong Letter, Ex. 9.)

12  These two facts were sufficient as a matter of law to

13  create a "reasonable suspicion" that BJ Davis was

14  guilty of violating Penal Code section 12021(a)(1).

15

16      Plaintiffs have failed to identify any evidence

17  that suggests a contrary conclusion.  They point to

18  the fact that the shotgun was registered to Julia

19  Davis only, and that BJ Davis had a "listed address"

20  other than the Yucca Valley house as evidence that BJ

21  Davis could not have been in possession of the

22  shotgun.  (Am. Opp'n at 25.)

23

24      While these facts are relevant to whether the

25  State could prove BJ Davis's guilt beyond a

26  reasonable doubt in a criminal prosecution, they do

27  not defeat probable cause.  The registration of a gun

28

to one owner in no way precludes another from possessing it, as more than one person may possess the same weapon concurrently.  See People v. Williams, 170 Cal. App. 4th 587, 625 (2009).  The Agents had significant evidence that BJ Davis actually resided in the Yucca Valley house, including declarations of Julia Davis's parents referring to the house as the residence of their "daughter and BJ Davis" (Wong Letter, Ex. 4 ¶ 2; Ex. 5 ¶ 2) and BJ Davis's own use of the Yucca Valley address as his residence when he was booked on the federal criminal charges.  (Wong Letter, Ex. 3.)  Plaintiffs also cite to Julia Davis's Declaration statement that BJ did not know she had the gun there, (Am. Opp'n at 25, citing Davis Decl. ¶ 78), but this declaration, prepared for this motion, was not before the Agents at the time the letter was prepared and sent, and is thus irrelevant to the probable cause determination.

There is a separate question as to whether the Agents had probable cause to believe that *Julia* Davis had violated section 12021(a)(1).  Since there was no evidence that Julia Davis was a felon, Agents Wong and Deal lacked probable cause to suspect that she personally and independently violated section 12021(a)(1).  Under California law, however, a person may be guilty of a crime by aiding and abetting the

commission of that crime.  Cal. Penal Code § 31.  A

person aids and abets a crime when he or she (1)

"act[s] with knowledge of the criminal purpose of the

perpetrator" and (2) has the "intent or purpose

either of committing, or of encouraging or

facilitating commission of, the offense."  People v.

Beeman, 35 Cal. 3d 547, 560 (1984).  One may aid and

abet another's possession of a weapon.  See In re

Malcolm M. 147 Cal. App. 4th 157, 169-70 (2007).


    At the time Agents Wong and Deal sent the letter,

they possessed evidence that (1) Julia Davis

purchased the gun; (2) Julia Davis had knowledge of

her husband's felony conviction;[22] and (3) the gun was

stored in their joint marital bedroom.  (Wong Letter,

Exs. 6-8.)  Agent Deal has stated that his

investigation led him to conclude that Julia Davis

"had purchased the shotgun" as "a straw man

purchase."  (Deal 2009 Dep. 234:11-235:16.)  This was

sufficient to establish a reasonable suspicion that

Julia Davis intentionally obtained the gun to

encourage or facilitate her husband's possession of

---

[22] At the hearing on this motion, Plaintiffs' counsel
suggested that this evidence did not show Julia Davis had
knowledge of BJ Davis's conviction at the time she
purchased the gun, but a review of the evidence suggests
otherwise.  Julia Davis filed copies of her husband's
conviction and pardon record in the MSPB proceedings in
October 25, 2004.  (Def.'s Ex. 1, Ex. 7.)  She purchased
the gun in April 2005.  (Def.'s Ex. 6.)

it, despite his felony conviction.  Again, Julia
Davis's statements in connection with this motion
that BJ Davis had no knowledge of the gun's
existence, while relevant to her ultimate guilt, do
not defeat probable cause.

Since Agents Wong and Deal possessed probable
cause to believe that BJ and Julia Davis both
violated California Penal Code § 12021(a)(1) when
they communicated with county prosecutors, the
Government's motion for partial summary judgment as
to Plaintiffs' malicious prosecution claim is
GRANTED.

**B.   Abuse of Process**

Plaintiffs' abuse of process claim is premised on
several distinct acts by federal agents.  They
contend the following actions constituted abuses of
process:

(1) The October 9, 2004 search of the Beverly
Hills Film Studios and seizure of Plaintiffs'
property from that location;

(2) The August 9, 2005 instigation of federal
immigration fraud charges against Plaintiffs
based on false information;

(3) The August 10, 2005 search of Plaintiffs'
residence and seizure of Plaintiffs' property
from that location;

(4) The failure to provide Plaintiffs with
exculpatory evidence obtained from the Screen
Actors Guild in the course of the federal
criminal action; and

1        (5) "Urging" the San Bernardino District Attorney
2       to file charges against Plaintiffs for unlawful
    possession of a firearm.

3   (SAC ¶¶ 133-37.)[23]

4

5       "To succeed in an action for abuse of process, a

6   litigant must establish that the defendant (1)

7   contemplated an ulterior motive in using the process,

8   and (2) committed a willful act in the use of the

9   process not proper in the regular conduct of the

10   proceedings." <u>Rusheen v. Cohen</u>, 37 Cal. 4th 1048,

11   1056 (2006).  The Government contends that Plaintiffs

12   cannot establish any of the five actions described

13   above constituted such an abuse of process for four

14   different reasons: (1) abuse of process is not

15   available to attack the initiation of a criminal

16   proceeding; (2) the OPR Agents' communications to law

17   enforcement are absolutely protected by statutory

18   privilege; (3) prior rulings of this Court bar any

19   _____

20      [23]   In their Amended Opposition, Plaintiffs argue
that federal agents also abused process by (1) "revealing
21   to dangerous suspects of an FBI investigation that
Plaintiffs were informants"; (2) "conducting warrantless
22   and unauthorized land and aerial surveillance"; and (3)
"attempting to use these trumped up [immigration fraud]
23   charges to nullify the EEOC ruling[.]"  (Am. Opp'n at
22.)  Such allegations are not contained in the operative
24   Second Amended Complaint, and thus cannot be considered
by the Court.  "[A] plaintiff may not amend his complaint
25   through arguments in his brief in opposition to a motion
for summary judgment." <u>Centex Homes v. Fin. Pac. Ins.</u>
26   <u>Co.</u>, No. CV F 07-00567 AWI, 2009 WL 5030138, at *5 (E.D.
Cal. Dec. 16, 2009), <u>quoting</u> <u>Speer v. Rand McNally & Co.</u>,
27   123 F.3d 658, 665 (7th Cir. 1997).  <u>See also</u> <u>Pickern v.</u>
<u>Pier 1 Imp. (U.S.), Inc.</u>, 457 F.3d 963, 968-69 (9th Cir.
28   2006).

claims relating to a failure to produce exculpatory
evidence; and (4) their claims related to searches
and seizure of property fail to state a claim.

### 1. Abuse of Process and the "Initiation" of Criminal Proceedings

The Government argues that "abuse of process is
not an appropriate cause of action to attack the
initiation of a criminal proceeding," as the tort is
"founded upon subsidiary activity within the
lawsuit." (Def.'s Mem. at p. 12, quoting Adams v.
Super. Ct., 2 Cal. App. 4th 521, 528 (1992).)  This
is a correct statement of the law.  The California
Supreme Court has held, "while a defendant's act of
improperly instituting or maintaining an action may,
in an appropriate case, give rise to a cause of
action for malicious prosecution, the mere filing or
maintenance of a lawsuit - even for an improper
purpose - is not a proper basis for an abuse of
process action." Oren Royal Oaks Venture v.
Greenberg, Bernhard, Weiss & Karma, Inc., 42 Cal. 3d
1157, 1169 (1986).  See also Lunsford v. Am.
Guarantee & Liab. Ins. Co., 18 F.3d 653, 655 (9th
Cir. 1994); Contemporary Servs. Corp. v. Staff Pro
Inc., 152 Cal. App. 4th 1043, 1059 (2007).  Although
the Government is correct as to this legal principle,
its application to this case is not as wide-reaching
as the Government suggests.

1    The Government contends that this principle bars
2    Plaintiffs' abuse of process claim insofar as it is
3    based on the "instigation" of the filing of the
4    federal criminal charges; the withholding of
5    exculpatory evidence in the federal criminal
6    proceedings; and the "urging" of state prosecutors to
7    bring the weapons possession charges.
8
9    The Court agrees that Plaintiffs cannot state a
10   claim for abuse of process based on either the
11   instigation of the federal criminal charges or the
12   OPR Agents' role in the filing of state criminal
13   charges under the case law noted above.  The sole
14   action for recovery in tort for the bringing of
15   meritless charges is malicious prosecution.  See
16   Bidna v. Rosen, 19 Cal. App. 4th 27, 40 (1993).  The
17   Government is thus entitled to summary judgment as to
18   the abuse of process claims based on these two
19   events.[24]
20
21    This principle has no bearing, though, on an
22   abuse of process claim based on the withholding or
23   concealment of exculpatory evidence.  Such a claim
24   directly targets "subsidiary activity within the
25
26   _____
27   [24]  The Court thus need not address the Government's
     argument that these actions are protected by the absolute
28   privilege for certain communications to law enforcement
     agencies provided by Cal. Civil Code § 47.

1  lawsuit," and has been held viable as a matter of law
2  by at least one other California district court.  <u>See</u>
3  <u>Garcia v. City of Merced</u>, 637 F. Supp. 2d 731, 751
4  (E.D. Cal. 2008).  Nonetheless, Plaintiffs have
5  failed to address this claim in their Opposition or
6  provide any evidence whatsoever concerning the
7  alleged withholding of exculpatory evidence, and it
8  appears this claim has been abandoned.  The
9  Government is thus entitled to summary judgment on
10 the abuse of process claim as to this event as well.

11

12     **2.   Abuse of Process and Search and Seizure**
13     The only remaining claimed abuses of process are
14 the October 2004 search of and seizure of property
15 from BHFS, and the August 2005 search of and seizure
16 of property from the Davises' Yucca Valley house.
17 The Government contends that Plaintiffs have failed
18 to state a claim regarding either of these searches.
19

20     The Government first contends that the stipulated
21 dismissal of Plaintiffs' conversion claim as to both
22 searches (Doc. No. 127) and the stipulated dismissal
23 of Plaintiffs' trespass claim as to the October 2004
24 search (Doc. No. 242) somehow bar these abuse of
25 process claims.  (Def.'s Mem. at p. 14.)  But neither
26 of the dismissals, which were without prejudice, have
27 any impact on the merits of the remaining claims.  "A
28

plaintiff who sets forth alternative remedies in
separate counts in his complaint may abandon or
dismiss one count without prejudice to his right to
proceed on the other." Amadeo v. Principal Mut. Life
Ins. Co., 290 F.3d 1152, 1159 (9th Cir. 2002). See
also Wilson-Cook Med., Inc. v. Wilson, 942 F.2d 247,
251 (4th Cir. 1991) (the effect of an order granting
voluntary dismissal is merely "to tailor the
complaint to its final form").

     The Government next argues that "the taking of
property, regardless of its lawfulness, is not an
abuse of process." (Def.'s Mem. at p. 14.)   The
Government provides no citation for this proposition,
nor has the Court located any supporting authority.
To the contrary, relevant California legal authority
suggests that the wrongful taking of property
pursuant to a judicial order can constitute an abuse
of process. See Microsoft Corp. v. A-Tech Corp., 855
F. Supp. 308, 311-12 (C.D. Cal. 1994) (improper
freezing of assets can serve as basis for abuse of
process claim); Bidna, 19 Cal. App. 4th at 40 (noting
abuse of process claims can arise from improper or
excessive attachment of property); 6A Cal. Jur. 3d
Assault and Other Wilful Torts § 17 ("An abuse of
process may occur where process is used for the

1  unauthorized purpose of acquiring property for one's
2  own use.").

3

4      Moreover, Plaintiffs have alleged that the
5  searches themselves, and not just the resulting
6  property seizures, were abuses of process.  (SAC ¶¶
7  133, 135.)  While the Government has stated that the
8  execution of search or arrest warrants lies "outside
9  the auspices of the judicial system," it cites no
10  authority for this proposition.  (Am. Reply at p. 8.)
11  A warrant is by its very nature an exercise of
12  judicial power, and is only issued based upon one or
13  more judicial determinations.  See, e.g., Florida
14  Dep't of State v. Treasure Salvors, Inc., 458 U.S.
15  670, 705 (1982) (warrant for arrest invokes judicial
16  power); Platz v. Marion, 35 Cal. App. 241, 245 (1917)
17  (employing "the authority to issue a warrant of
18  arrest . . . necessarily exercises the judicial
19  powers").

20

21      Many courts, both in California and in other
22  jurisdictions, have recognized that an abuse of
23  process claim may lie where an arrest or search
24  warrant was improperly obtained.  See Garcia, 637 F.
25  Supp. 2d at 751 (citing Gonzalez v. Immigration &
26  Naturalization Serv., 405 F.3d 45, 50 (1st Cir.
27  2005)).  See also U.S. Steel, LLC v. Tieco, Inc., 261

28

F.3d 1275, 1291-92 (11th Cir. 2001) (applying Alabama
law); <u>VanZandt v. Fish & Wildlife Serv.</u>, 524 F.
Supp. 2d 239, 246-47 (W.D.N.Y. 2007) (applying New
York law).  While claims alleging that the *execution*
of the warrant was an abuse of process are less
common, several courts in other states have suggested
the execution of a warrant can constitute an abuse of
process.  <u>See, e.g.</u>, <u>Gibson v. Regions Fin. Corp.</u>,
557 F.3d 842, 845 (8th Cir. 2009) (applying Arkansas
law); <u>Washington v. Drug Enforcement Admin.</u>, 183
F.3d 868, 875 (8th Cir. 1999) (applying Missouri
law); <u>Eliason Corp. v. Bureau of Safety & Regulation
of Mich. Dep't of Labor</u>, 564 F. Supp. 1298, 1307
(W.D. Mich. 1983) (applying Michigan law).  Under
California law, as in these other states, "[t]he
essence of the tort 'abuse of process' lies in the
misuse of the power of the court; it is an act done
in the name of the court and under its authority for
the purpose of perpetrating an injustice."  <u>Estate of
Tucker ex rel. Tucker v. Interscope Records, Inc.</u>,
515 F.3d 1019, 1037 (9th Cir. 2008), <u>quoting</u> <u>Stolz v.
Wong Communications Ltd. P'ship</u>, 25 Cal. App. 4th
1811, 1822 (1994).  The Court therefore concludes
that the misuse of a judicially-sanctioned warrant to
search or take property for improper motives, as
alleged here, may constitute an abuse of process.

1    The Court thus proceeds to examine the evidence
2  presented as to each of the two searches in order to
3  determine if Plaintiffs have sufficiently stated an
4  abuse of process claim.

5

6    **a)   The October 2004 Search**

7    There is insufficient evidence on the record to
8  support Plaintiffs' claim for abuse of process based
9  on the October 2004 search of and seizure of property
10 from BHFS.

11

12   In their Amended Opposition, Plaintiffs do not
13 discuss this incident at all.  Julia Davis addresses
14 the seizure of documents from BHFS in vague terms in
15 her Declaration (Davis Decl. ¶ 54), stating:

16      The agents also took advantage of this
        investigation to improperly seize personal
17      documents and materials belonging to both BJ
        and I without a warrant and without any
18      consent from either one of us.  The seized
        documents included files on my EEOC case
19      against the government, banking and files
        collected on the investigations launched
20      against BJ Davis and I by Agents Deal,
        Kaufer, and Broyles.
21
22 (Davis Decl. ¶ 54.)  Julia Davis does not indicate
23 she was present at the scene of the search, nor that
24 she personally observed the seizure of any documents
25 or materials.  Therefore the statement lacks
26 foundation, and is inadmissible.

27

28

The only evidence cited as support for Julia Davis's statement is an excerpt from a brief filed by the Government in the federal criminal case, which states that "Documents obtained from the Beverly Hills Film Studio were not seized, as alleged by defendants, but provided voluntarily by the studio." (Davis Decl. ¶¶ 54, 135, Ex. 50 at p. 9.) "Statements in briefs are not evidence of the facts asserted."  In re Heritage Bond Litig., No. CV 02-1475-DT(RCx), 2004 WL 1970058, at *4, n. 4 (C.D. Cal. July 23, 2004), quoting Bell v. United Princeton Props., Inc., 884 F.2d 713, 720 (3d Cir. 1989).  See also Carrillo-Gonzalez v. Immigration & Naturalization Serv., 353 F.3d 1077, 1079 (9th Cir. 2003) (argument by counsel is not evidence).  While in some circumstances, representations in briefs may be considered admissions, see Marceau v. Int'l Bhd. of Elec. Workers, 618 F. Supp. 2d 1127, 1170 n. 13 (D. Ariz. 2009) (citing United States v. One Heckler-Koch Rifle, 629 F.2d 1250, 1253 (7th Cir. 1980)), the cited material could only be an admission that some documents were received from BHFS at some point in time.  This does not provide any details as to what documents were obtained, or the circumstances under which they were obtained.  Accordingly, Plaintiffs have failed to produce sufficient evidence to support

an abuse of process claim based on any search of, or

seizure of property from, BHFS.


### b)   The August 2005 Search

Plaintiffs have produced significant evidence

about the August 2005 raid and search of their

residence, as noted above.  This evidence is

sufficient to create a factual question as to whether

federal agents committed an abuse of process when

they conducted that search pursuant to the arrest

warrant.


The use of the arrest warrant to launch the raid

and search on Plaintiffs' house, and to seize

property therein, will be an abuse of process if the

involved agents "(1) contemplated an ulterior motive

in using the process, and (2) committed a willful act

in the use of the process not proper in the regular

conduct of the proceedings." Rusheen, 37 Cal. 4th at

1056.  "The ulterior motive element can be inferred

from proof of a willful improper act." Flores v.

Emerich & Fike, No. 1:05-CV-0291 AWI, 2008 WL

2489900, at *13 (E.D. Cal. June 18, 2008); see also

Charles J. Vacanti, M.D., Inc. v. State Comp. Ins.

Fund, 24 Cal. 4th 800, 824 (2001).

The events of August 10, 2005 were carried out in accordance with an operational plan drafted by Agent Deal, utilizing the resources of the SRT, which were obtained by Agent Deal.  There is thus no dispute that the events of that day were the "willful" acts of federal employees.  A more difficult question, though, is whether the search was "not proper in the regular conduct of the proceedings."  In light of the substantial evidence presented by Plaintiffs as to the magnitude of the search, and the Government's failure to identify undisputed facts in support of a contrary finding, the Court holds that a reasonable fact finder could find the extreme nature of the search and raid of the Davises' Yucca Valley home was "not proper in the regular conduct of the proceedings."

Throughout their opposition, Plaintiffs have identified evidence that suggests the degree of force used in the search was severe, particularly in light of the nonviolent nature of the charges against the Davises.  An Expert Witness, Retired CBP Supervisor Leonard Rios, stated that, in his expert opinion, without Agent Deal's specific (false) claim to the SRT that BJ Davis had previously been convicted of "first degree murder," the SRT would not have been involved in the arrest at all.  (Davis Decl., Ex. 77

1  at p. 33.)[25]  Agent Deal has admitted that he had

2  reviewed the records of BJ Davis's conviction at the

3  time he met with the SRT, (Deal 2009 Dep. at 129:14-

4  134:6), and those records showed that BJ Davis had

5  been convicted of and pardoned of the lesser charge

6  of manslaughter.

7

8      The reports of the Agents involved suggest no

9  attempt to arrest the Davises in a more peaceable

10  manner was ever even considered.  According to Julia

11  Davis's parents, in the course of the search, Agent

12  Deal told them that Mrs. Davis was a "domestic

13  terrorist," a statement without any support.  (Kot

14  Decl. ¶ 10; Kovalska Decl. ¶ 11.)  At some point on

15  the day of the raid, someone scrawled the word

16  "Boo!" and crossed out the date on Julia Davis's

17  calendar, located in her home.  (Davis Decl., Ex.

18  61.)  As discussed above, several witnesses have

19  testified that documents and other items were seized

20  from the home, though no receipt was given.  The

21  search of the home continued long after it was

22  determined the persons named in the arrest warrant

23  were not present.  Together, this evidence creates a

24  _____

25      [25] At the hearing on the Motion, counsel for the
   Government stated he intends to challenge Rios's

26  qualifications as an expert witness should this case
   proceed to trial.  However, the Government made no

27  objection to the consideration of Rios's declaration in
   connection with this Motion, despite the opportunity to

28  do so in its Reply.

question of material fact as to whether the manner in which the arrest warrants were executed was proper.

There is also sufficient evidence for a reasonable fact finder to conclude the OPR Agents had an ulterior, improper motive: retaliation for Julia Davis's successful EEOC complaint.  "[A]n arrest warrant is not to be used for unlawful retaliation." Garcia, 637 F. Supp. 2d at 751.  In addition to the unusual degree of force used in executing the arrests, the arrest warrants were executed two months after the EEOC ALJ issued his initial decision in Julia Davis's sexual harassment case, which was in her favor and highly critical of CBP, ICE, and their internal investigators.  (EEOC Op.)  Agents Deal, Kaufer, and Wong had all been involved in Julia Davis's EEOC and MSPB proceedings.  See, e.g., Davis Decl., Ex. 9 (January 10, 2005 Dep. of Jeffrey Deal); Ex. 18 (January 10, 2005 Dep. of James Wong); Ex. 33 (January 10, 2005 Dep. of Herbert Kaufer.)  One week after the search, CBP moved to hold the ALJ's decision in abeyance based on the federal criminal charges.  (Davis Decl., Ex. 2.)  The sum total of these facts is sufficient to allow a fact finder to infer a retaliatory or malicious motive in the execution of the search.  Cf. George v. Cal. Unemployment Ins. Appeals Bd., 179 Cal. App. 4th 1475

1   (2009) (finding sufficient evidence to support an

2   inference of retaliatory motive for FEHA claim);

3   McRae v. Dep't of Corrs. & Rehab., 142 Cal. App. 4th

4   377, 388 (2006) (knowledge of protected activity and

5   proximity in time between protected action and

6   alleged retaliatory act sufficient to establish prima

7   facie case under FEHA).  Plaintiffs have therefore

8   produced sufficient evidence to allow a reasonable

9   fact finder to conclude the August 2005 search was an

10  abuse of process.[26]

11

12      The Court thus GRANTS the Government's motion for

13  partial summary judgment as to the abuse of process

14  claim as to all alleged abuses except the August 2005

15  _____

16  [26] At the hearing on this Motion, Plaintiffs' counsel
    suggested that a question of fact as to whether the

17  August 2005 search constituted an abuse of process
    potentially limited the Government's ability to use the

18  shotgun seized in that search to support defendant's
    showing of probable cause on the malicious prosecution

19  claim.  Even if the shotgun was the fruit of an unlawful
    seizure, though, in a civil proceeding like this one,

20  there is no exclusionary rule which would bar the
    Government from introducing it as evidence in a malicious

21  prosecution lawsuit to establish probable cause.  See
    Ecker v. Raging Waters Group, Inc., 87 Cal. App. 4th

22  1320, 1329 (2001).  See also Pennsylvania Bd. of
    Probation & Parole v. Scott, 524 U.S. 357, 363 (1998)

23  (noting exclusionary rule generally applies only to
    criminal trials); Townes v. City of New York, 176 F.3d

24  138, 146 (2d Cir. 1999) (declining to extend the fruit of
    the poisonous tree doctrine to section 1983 action);

25  Cyrus v. City of New York, No. 06 CV 4685(ARR), 2010 WL
    148078, at *4 (E.D.N.Y. Jan. 14, 2010) ("the exclusionary

26  rule does not apply to the probable cause determination
    in malicious prosecution claims"); McDaniel v. City of

27  Seattle, 65 Wash. App. 360, 364-67 (1992) (evidence
    suppressed in criminal proceeding admissible for showing

28  probable cause in malicious prosecution civil suit).

search of and seizure of property from the Davises'
home, and DENIES the motion as to the August 2005
search.

### VI. CONCLUSION

In accordance with the foregoing, the
Government's Motion for Partial Summary Judgment is
GRANTED as to Plaintiffs' malicious prosecution claim
in its entirety, and GRANTED in part and DENIED in
part as to Plaintiffs' abuse of process claim.


Dated: _January 28, 2010_      _____
                               VIRGINIA A. PHILLIPS
                               United States District Judge